IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THEOPOLIS WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:17-CV-1247-MAB |
| | ) |
| KAREN JAIMET, LARUE LOVE, | ) |
| CHRISTINE BROWN, and | ) |
| JOHN BALDWIN, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Currently pending before the Court is the motion for summary judgment filed by Defendants Karen Jaimet, Larue Love, Christine Brown, and John Baldwin (Doc. 59). Also pending before the Court is a motion to strike filed by Plaintiff Theopolis Williams (Doc. 69), in which he seeks to strike certain materials from Defendants' motion for summary judgment. For the reasons explained below, Defendants' motion for summary judgment is granted and Plaintiff's motion to strike is denied.

## BACKGROUND

Plaintiff Theopolis Williams filed this action pursuant to 42 U.S.C. § 1983 claiming prison officials at Pinckneyville Correctional Center were deliberately indifferent to his serious medical needs. Plaintiff suffers from folliculitis on his face and head.[1] When he

---

[1] Pseudofolliculitis barbae is a chronic, inflammatory condition of the hair follicles and surrounding skin that develops primarily as a result of shaving. In short, it is ingrown hairs. It occurs mainly on the face and

arrived at Pinckneyville in 2014, he had an Andis-brand trimmer that he claims helped him avoid folliculitis flare-ups. In late 2016, the trimmer stopped working properly. He made repeated requests to Defendants for permission to mail his trimmer to the manufacturer for repair while it was still under warranty, but Defendants denied his requests. Without the trimmer, Plaintiff's folliculitis flared-up. Following a threshold review of the complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on an Eighth Amendment deliberate indifference claim against Karen Jaimet, Larue Love, Christine Brown, and John Baldwin for denying his requests to have his trimmer repaired (Doc. 8).

On July 31, 2019, Defendants filed their motion for summary judgment (Doc. 59).

---

neck and is particularly common among African American men and others with coarse, tightly curled hair (as opposed to hair that grows straight out of the follicle). There are two types of ingrown hairs. Transfollicular penetration occurs when the hair has been cut too short and the hair retracts below the surface of the skin; it curls as it grows and pierces the wall of the hair follicle from inside. In other words, the hair is trapped below the skin's surface. Extrafollicular penetration occurs when the freshly shaved hair is above the skin's surface, but as it grows it curls back toward the skin and the freshly sharpened tip penetrates and reenters the skin. Both types of ingrown hair cause itching, irritation, inflammation, and the development of papules (pink or red bumps on the skin) and pustules (bumps similar to papules but filled with fluid or pus and have a yellow or white center). The best and only certain way to cure this type of folliculitis is to stop shaving and allow the hair to grow. For men who are required to, or simply prefer to shave, adjusting their shaving techniques and using an electric shaver may help. Adebola Ogunbiyi, *Pseudofolliculitis barbae; Current Treatment Options*, CLINICAL, COSMETIC AND INVESTIGATIONAL DERMATOLOGY, April 16, 2019, at 241–27, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6585396/; AMERICAN OSTEOPATHIC COLLEGE OF DERMATOLOGY, *Pseudofollliculitis Barbae*, https://www.aocd.org/page/pseudofolliculitisb (last visited May 13, 2020); Gary J. Brauner, MD, *Pseudofolliculitis barbae*, SKIN OF COLOR SOCIETY, https://skinofcolorsociety.org/dermatology-education/1408-2/ (last visited May 13, 2020); Roopal v. Kundu, MD, and Stavonnie Patterson, MD, *Dermatologic Conditions in Skin of Color: Part II. Disorders Occurring Predominantly in Skin of Color*, AMERICAN FAMILY PHYSICIAN, June 15, 2013, https://www.aafp.org/afp/2013/0615/p859.html#afp20130615p859-b10.

Plaintiff filed his response in opposition on September 27, 2019 (Doc. 70). Defendants did not file a reply or otherwise dispute the "Additional Undisputed Material Facts" asserted by Plaintiff in his response brief. Along with his response brief, Plaintiff also filed a motion to strike certain materials from the motion for summary judgment (Doc. 69). Defendants filed a motion in opposition to the motion to strike (Doc. 71).

## MOTION TO STRIKE

Plaintiff asks the Court to strike records from the Andis Company that Defendants rely on to support their contention that Plaintiff's trimmer was no longer under warranty when he sought to have them repaired (Doc. 69; *see also* Doc. 60, p. 5). The date the trimmer was purchased and whether it was still under warranty are issues of fact that cannot be resolved at this stage. More importantly, they are issues that do not factor into the Court's analysis of the motion for summary judgment. The Court does not rely on the Andis Company records in any way in resolving the motion for summary judgment. Therefore, the Court need not resolve this aspect of Plaintiff's motion at this time and Plaintiff's request is denied.

Plaintiff also asks the Court to strike certain portions of Timothy Adesanya's deposition testimony relied on by Defendants (Doc. 69; *see also* Doc. 60-3). Adesanya is a physician assistant at Lawrence who issued Plaintiff a medical permit for his Andis trimmer in December 2017. Plaintiff wants to strike paragraphs 12, 13, 14, 15, and 16 of Defendants' "undisputed material facts," as well as pages 7 and 10 of the argument section of Defendants' brief, which all include Adesanya's assertions about his medical training and qualifications, his professional opinion on the necessity or utility of using

facial trimmers to treat folliculitis, and his claim that he would not have issued the medical permit if he had been aware that the previous permit had been rescinded (Doc. 69). As grounds for striking Adesanya's testimony, Plaintiff claims Defendants did not disclose Adesanya by name as an expected witness or as an expert witness (*Id.*). Plaintiff further claims he was harmed by Defendants failure to disclose because when he deposed Adesanya, he was "substantially surprised" by the opinions Adesanya expressed (*Id.*). Plaintiff contends Adesanya expressed these opinions voluntarily and without solicitation by Plaintiff, and they were not preceded by any disclosures that would have allowed Plaintiff to prepare questions concerning these opinions (*Id.*). Furthermore, because discovery was closed at the time of Adesanya's deposition, Plaintiff did not have an opportunity to develop or prepare counter opinions (*Id.*).

None of Plaintiff's arguments have any merit. Defendants disclosed as potential witnesses "any doctors or medical personnel involved that may have treated Plaintiff for his injuries that he allegedly sustained" and "[a]ny doctors, nurses, or other medical staff that may have treated Plaintiff for his folliculitis" (Doc. 71-1, Doc. 71-2). The failure to specifically identify Timothy Adesanya by name was harmless. Plaintiff was aware of Adesanya's identity (presumably from the medical records). Moreover, Plaintiff *himself* identified Adesanya as a potential witness in his own disclosures, and he deposed Adesanya. Therefore, Plaintiff clearly suffered no prejudice or surprise by Defendants failing to disclose Adesanya by name.

Furthermore, Adesanya did not have to be disclosed as an expert witness because he is not a retained expert. He is a treating medical provider. As a treating medical

provider, he is able to testify as a fact witness about his encounter with Plaintiff, including the nature and severity of Plaintiff's condition at the time he saw Plaintiff, potential treatment options for Plaintiff's condition based on his experience and training, as well as the reasons for the treatments he provided.[2]

The Court is unpersuaded by Plaintiff's argument that he was "substantially surprised" by portions of Adesanya's testimony. It is customary and expected to ask a treating medical provider about their training, qualifications, and experience during a deposition—it is basic background information. It is also customary to ask a treating medical provider about the possible treatment options, the utility of those options, and the reasons why those options were or were not chosen—obtaining that information is a

---

[2] "A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report." FED. R. CIV. P. 26, Advisory Committee Notes to the 1993 amendments. *See also Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2018 WL 10609878, at *4 (N.D. Ill. Mar. 20, 2018) (treating physician "may testify as a fact witness regarding personal observations, examinations, and diagnoses completed during the course of treatment and contained within the relevant medical records.") (citation and internal quotation marks omitted); *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 812 (E.D. Wis. 2010) ("It is beyond question that . . . a treating physician can testify with regard to his or her observations of and treatment provided to a patient[.]"); *Wilson v. Grable*, No. 1:08-CV-0660-RLY-TAB, 2010 WL 2464840, at *3 (S.D. Ind. June 4, 2010) ("Generally, 'a treating physician may testify about his or her scope of treatment, observation, and diagnosis without producing an expert report.'") (quoting *Cobble v. Wal–Mart Stores East, L.P.*, No. 1:10–CV–010, 2010 WL 1088513, at *2 (N.D. Ind. Mar. 19, 2010)); *McCloughan v. City of Springfield*, 208 F.R.D. 236, 242 (C.D. Ill. 2002) ("[T]reating physicians may offer opinion testimony on causation, diagnosis, and prognosis without the prerequisite of providing a Rule 26(a)(2)(B) report.") *But see Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734–35 (7th Cir. 2010) (holding that a treating physician must be disclosed as an expert witness and provide an expert report under Rule 26(a)(2) when the physician is offered to provide an opinion as to the cause of the plaintiff's injury and the opinion was not made during the course of providing treatment, but rather at the request of counsel in anticipation of litigation).

fundamental objective of deposing a medical provider. The fact that Adesanya offered this information without being prompted by Plaintiff's counsel is immaterial. Accordingly, there is no reason to strike paragraphs 12, 13, 14, or 15, or the portions of Defendants' argument that corresponds with these paragraphs, and Plaintiff's request to do so is denied.

The only portion of Adesanya's testimony that appears potentially troublesome is his testimony regarding information contained in the Dermatology Access Book, which is contained in paragraph 16 (Doc. 60, p. 3, ¶16; Doc. 60-3, p. 35). This statement, however, does not factor into the Court's analysis of the summary judgment motion, and therefore the Court need not decide right now whether this statement is admissible or not. Accordingly, Plaintiff's request to strike paragraph 16 and the portions of Defendants' argument that corresponds with these paragraphs is denied without prejudice.

## FACTS

Plaintiff Theopolis Williams has suffered from folliculitis on his face and head for many years (Doc. 70-1, p. 1). As his hairs grow, they curl inward back into his skin, causing bumps and pustules similar to acne (*Id.*). There are times when the bumps on Plaintiff's face and head became open sores that bled, oozed puss, and became infected (*Id.*). The sores cause a burning sensation on Plaintiff's skin (*Id.*). According to Plaintiff, he is "in a great deal of pain and discomfort" during a folliculitis flare-up (*Id.*; *see also* Doc. 60-1, pp. 5, 16–17).

Plaintiff stated that when he has a flare-up, he has to seek medical treatment (Doc. 70-1, p. 1). Through the years, Plaintiff has been given oral antibiotics, ointments and

creams, and antibiotic soap to treat the folliculitis (*Id.*; Doc. 60-1, pp. 5–6). While at Illinois River, Plaintiff purchased an Andis-brand trimmer from the commissary (Doc. 60-1, pp. 6, 13; Doc. 70-1, pp. 2, 6).³ The company touts the trimmer as having blades that are specifically designed for shaving curly hair and avoiding ingrown hairs (Doc. 70-1, pp. 2, 6–7). According to Plaintiff, the Andis trimmer "work[ed] remarkably well at avoiding folliculitis flare ups" (*Id.* at p. 2). In contrast, the other brand of trimmers sold at the prison commissaries, such as Norelco and Conair, irritate his skin and make the folliculitis worse (*Id.*). The same is true of the hair removal cream, Magic Shaving Cream, that is sold at the prison commissaries (*Id.*; *see also* Doc. 60-1, pp. 7, 9).

At some point, the Department of Corrections stopped selling the Andis trimmers at the prison commissaries (Doc. 70-1, p. 2). When Plaintiff was transferred from Illinois River to Hill Correctional Center, his Andis trimmer was taken away from him (Doc. 60-1, p. 6). He spent a couple years at Hill and was then transferred to Lawrence (*Id.*). The warden at Lawrence allowed Plaintiff to purchase a new Andis trimmer directly from the company; he paid $62 for it (*Id.*, at pp. 6, 8; Doc. 70-1, p. 2). Plaintiff was given a medical permit for the trimmer at Lawrence (Doc. 60-1, pp. 6, 8; Doc. 70-1, p. 6). Plaintiff was then transferred to Menard (Doc. 60-1, p. 3). The Andis trimmer was initially taken away at Menard, but Plaintiff was eventually given a medical permit to use it in the health care

---

³ Defendants refer to them as "clippers" in their brief (Doc. 60), while Plaintiff refers to them as "trimmers" (Doc. 70). LaRue Love attempted to explain the distinction between the two at his deposition (*see* Doc. 60-4, pp. 13–16). This purported distinction, however, does not appear to be material to the summary judgment analysis. The Court has chosen to refer to the item as a "trimmer" throughout this Order. There is no significance to this choice and nothing should be inferred from it.

unit at Menard (*Id.* at pp. 4, 9, 13; Doc. 70-1, pp. 2–3). Plaintiff was then transferred to Pinckneyville in March 2014, where he arrived with his Andis trimmer and his medical and personal property permits from Menard (Doc. 60-7, p. 6; Doc. 70-1, p. 3; *see also* Doc. 60-8, p. 4).

At Pinckneyville, trimmers sold at the commissary are clear and battery-operated (Doc. 60-7, p. 4). An inmate must have a personal property permit in order to possess a trimmer and keep it in their cell (Doc. 60-4, pp. 4–5; Doc. 70-1, p. 3). If a permitted item breaks and it is still under warranty, the inmate can give it to the Personal Property Officer, who will send it to the company to be repaired (Doc. 60-4, pp. 4, 6). The same procedure is followed for an item that is no longer sold in the commissary but is still permitted, so long as the item is still under warranty (*Id.* at p. 6). However, the discontinued item will not be sent out for repair if it has been subsequently determined that the property presents some sort of safety and security issue (*Id.* at p. 6).[4]

Inmates cannot have an item that is not sold at the commissary (aside from books and magazines) unless the item is medically necessary (Doc. 60-7, pp. 4, 9). In that case, the inmate would need a medical permit issued by a doctor (which certifies that the item was a medical necessity), as well as, a personal property permit in order to possess the

---

[4] For example, radios and trimmers that were not in a clear case used to be sold at prison commissaries (Doc. 60-4, p. 6). It was determined that these items presented a safety and security risk because they "couldn't be shaken down visibly to make sure no contraband was contained inside of them" (*Id.*). They were "kind of grandfathered in," meaning inmates who owned these items were allowed to keep them until they broke; once they broke, the inmates were not allowed to send the items out for repair and had to purchase new ones (*Id.*).

item (*Id.* at pp. 3, 4; Doc. 60-4, pp. 10–11; Doc. 70-1, p. 2). If the medically necessary item needed to be repaired or replaced, the healthcare unit would take care of doing so (Doc. 60-8, p. 13). If the doctor determined that the item was no longer medically necessary, then the item would no longer be authorized and the inmate could not possess it (Doc. 60-4, pp. 10–11; Doc. 60-7, p. 5).

According to Plaintiff, when he first arrived at Pinckneyville, he had permission from a doctor—although not a formal medical permit—to use his Andis trimmer in the health care unit, and he did so "regularly" (Doc. 70-1, p. 3; *see also* Doc 60-1, p. 35).[5] The parties agree that in May 2014, Christine Brown—the Health Care Unit Administrator at Pinckneyville—informed Plaintiff that he did not need a medical permit to keep and use the trimmer in his cell in general population; he could have them in his cell because he had a personal property permit (Doc. 60-1, p. 24; Doc. 60-8, p. 6; Doc. 70-1, p. 3). The parties also agree that Plaintiff thereafter kept the trimmer in his cell (*see* Doc. 60-1, Doc. 70-1; *see also* Doc. 60-8, pp. 5–6, 7).

In May 2015, Plaintiff's trimmer needed to be repaired and he asked the Personal Property Officer at Pinckneyville to send it off for repair or replacement since it was still under warranty (Doc. 70-1, p. 3). His request was eventually granted, the trimmer was sent to the company, and Plaintiff got the trimmer back in August 2015 (*Id.* at pp. 3, 8, 9).

---

[5] This assertion may be contradicted by the medical records, but the Court cannot say for certain because those records were not submitted. They were, however, discussed during Christine Brown's deposition (Doc. 60-8, pp. 4–6). Based on that discussion, the medical records seem to suggest that Plaintiff did not have access to his trimmer until May 2014 (*Id.*).

At some unspecified time in "late 2016," the trimmer once again needed repair (Doc. 70-1, p. 3). According to Plaintiff, the trimmer was still under warranty (Doc. 70-1, pp. 3–4), which Defendants dispute (Doc. 60, p. 5). Plaintiff asked the Personal Property Officer to send the trimmer out for repair (Doc. 70-1, pp. 3–4; *see also* Doc. 60-2). Plaintiff says he was told that he needed permission from Assistant Warden Larue Love (Doc. 70-1, p. 3).[6] Plaintiff claims Love refused to grant permission for the repair and told Plaintiff to purchase a new one from the commissary (*Id.*). Love says the trimmer could not be sent out for repair due to safety and security issues (Doc. 60-4, p. 7). Love's recollection was that the trimmer was not clear (*Id.*). Karen Jaimet, the former Warden at Pinckneyville, was also under the impression that the trimmer was not clear (Doc. 60-7, pp. 8, 9). However, other internal documents from the prison, including Plaintiff's personal property permit, indicate the trimmer was, in fact, clear (Doc. 70-1, p. 9; *see also* Doc. 60-4, p. 7). Warden Jaimet also indicated the Andis trimmer had a cord, but inmates are only allowed to have the battery-operated trimmers sold at the commissary; they can only have a plug-in trimmer if it is a medical necessity (Doc. 60-7, p. 4; *see also* Doc. 60-2).[7]

---

[6] Larue Love was the Assistant Warden of Operations at Pinckneyville as of January 2016 (Doc. 60-4, pp. 2).

[7] Karen Jaimet became the Assistant Warden of Programs at Pinckneyville in September 2016, and she was promoted to Acting Warden in January 2017 (Doc. 60-7, pp. 2, 8). By June 2018, Jaimet had been promoted to a statewide Program Compliance Officer and Christopher Scott Thompson was the Warden at Pinckneyville (*Id.*; Doc. 60-5, p. 2).

According to Plaintiff, after his requests to have the trimmer repaired were denied by Personal Property, he requested a medical permit from the health care unit as a means of assuring that the trimmer would be sent out for repair (Doc. 70, p. 6; *see also* Doc. 60-8, pp. 11–12). On November 22, 2016, Dr. Scott issued a medical permit for a "facial trimmer," effective for one year (Doc. 60-8, pp. 11–12; Doc. 70-1, pp. 3, 10). Plaintiff did not provide any specific testimony about this visit (*see* Doc. 60-1, Doc. 70-1). And the medical records from this visit are conspicuously absent from the record (*see* Doc. 60; Doc. 70). The records were briefly discussed, however, during Christine Brown's deposition (Doc. 60-8, pp. 11–12). Ms. Brown indicated that the visit was a routine physical exam done on or around Plaintiff's birthday (*Id.*), although Plaintiff claims the visit was because he sought treatment for a folliculitis flare-up (Doc. 70-1, p. 3). The nurse practitioner wrote in the medical record "Permit for trimmers. Has trimmers. Needs permit" (Doc. 60-8, p. 11). Dr. Scott then issued the permit that same day (*Id.* at pp. 11–12; Doc. 70-1, pp. 3, 10). There is no indication or discussion anywhere in the record about the condition of Plaintiff's face at the time of the visit, whether he needed any antibiotics or other treatments, why the nurse practitioner thought a permit was needed, or the doctor's reasons for issuing the permit (*see* Doc. 60; Doc. 70).

After the medical permit was issued, Plaintiff said he asked Christine Brown to instruct the property officer to send the trimmer out for repair (Doc. 70-1, p. 4). For her part, Christine Brown testified that a nurse came to her in early January 2017 about getting Plaintiff's trimmer fixed (Doc. 60-8, pp. 12–13). Following that conversation, the nurse noted in the medical records, "MD is supposed to review chart and discontinue

permit and offender is to buy clippers off commissary" (*Id.*). According to Plaintiff, Ms. Brown requested or arranged for the doctor to rescind the permit (Doc. 70, pp. 6, 9; Doc. 70-1, p. 4). However, Ms. Brown clearly testified that it was up to the doctor to determine whether or not to rescind the permit (Doc. 60-8, p. 12). The doctor discontinued Plaintiff's medical permit for the trimmer (Doc. 60-2; Doc. 60-8, p. 13).[8] Christine Brown testified that the doctor wrote in the medical records that "there's no current medical indication for hair clippers . . . Sending his clippers out for service constitutes a security issue" (Doc. 60-8, p. 13).

    Plaintiff claims that he was never informed that his medical permit for the trimmer had been rescinded and he retained physical possession of the medical permit for the entire year it was effective (Doc. 70-1, p. 4). Plaintiff also claims that he had the trimmer in his cell until he filed this lawsuit (Doc. 70-1, p. 4). However, other evidence in the record indicates that Plaintiff *was* told—multiple times—that the medical permit had been rescinded. For example, the cumulative counseling summary indicates that Counselor Shane Mercier advised Plaintiff on January 7, 2017 that his medical permit was discontinued, and that four days later Warden Jaimet spoke with Plaintiff at his cell and told him the doctor discontinued the medical permit and he should buy a new trimmer from the commissary (Doc. 60-2). Additionally, Christine Brown testified that there is a note in the medical records dated February 16, 2017, which states Plaintiff was told his

---

[8] The exact date on which the doctor rescinded the medical permit was not provided by either party, nor was the pertinent medical record provided (*see* Doc. 60; Doc. 70).

medical permit was discontinued and it was up to security whether his trimmer got sent out for repair (Doc. 60-8, p. 13).

Plaintiff says he sent requests to the health care unit in January and February 2017 to send the trimmer out for repair or replacement (Doc. 70-1, p. 4). Christine Brown responded to at least one, stating the trimmer was "not a medical issue" and the health care unit "had nothing to do with fixing [the trimmer]" (Doc. 70-1, pp. 4, 12).

In February 2017, Plaintiff sent an offender request to Larue Love and asked him to authorize sending the trimmer out for repair (Doc. 60-4, pp. 12–13; *see also* Doc. 1, p. 17). Warden Love responded, "see grievance response" (Doc. 60-4, pp. 12–13; Doc. 1, p. 17).

Plaintiff says he sent a request to John Baldwin, the Director of the IDOC, in April 2017 asking him to authorize the repair of his trimmer (Doc. 60-1, pp. 14, 32; Doc. 70-1, pp. 4, 14; *see also* Doc. 1, p. 8, 20–21). The documentary evidence shows that Plaintiff's request was submitted to the Administrative Review Board ("ARB") (Doc. 70-1, pp. 4, 14). The ARB responded on May 11, 2017, indicating Plaintiff's correspondence was being returned without being addressed; the response was signed by Keith McReynolds (*Id.*). Plaintiff testified that he never personally spoke to Baldwin (Doc. 60-1, pp. 14, 32).

In May 2017, Plaintiff sent a direct request to Warden Jaimet to authorize the trimmer to be repaired (Doc. 70-1, pp. 4, 13). The response said, "NO. This has been addressed" (Doc. 70-1, pp. 4, 13). Warden Jaimet, however, testified that she did not recall receiving this request and that it did not look like her handwriting (Doc. 60-7, pp. 6–7).

Aside from these documented requests, Plaintiff indicated that he made numerous other requests and had face-to-face conversations with Larue Love, Karen Jaimet, and Christine Brown about having the trimmer repaired (Doc. 70-1, pp. 3–5; Doc. 60-1, p. 14; *see also* Doc. 60-2), which Defendants did not dispute.

In December 2017, Plaintiff saw Physician Assistant Timothy Adesanya and requested that his medical permit for the trimmer be renewed (Doc. 60-3, pp. 20, 24, 27–28). PA Adesanya noted that Plaintiff had "lesions" on his chin and he prescribed an oral antibiotic to Plaintiff (*Id.* at pp. 27–28). He also issued a medical permit for the Andis trimmer (Doc. 70-1, pp. 4, 11). PA Adesanya testified that he did not think Plaintiff needed the trimmer, but he gave Plaintiff the permit anyway because he was obligated to follow Dr. Scott's treatment plan and renew the permit that Dr. Scott had issued a year prior (Doc. 60-3, pp. 20, 28–29, 31). PA Adesanya further testified that he was unaware that Dr. Scott had rescinded the previous permit, and had he known, he would not have given Plaintiff the permit (*Id.* at pp. 29, 31, 36).

Despite having a new medical permit, Plaintiff's trimmer was still not sent out for repair (Doc. 70-1, p. 5). However, there is no evidence that Plaintiff made any requests to the named Defendants to have his trimmer repaired after he got the new permit from PA Adesanya (*see* Doc. 60-1, Doc. 70-1). In December 2018, Plaintiff was transferred to Western Correctional Center, where he was not allowed to have an Andis trimmer (Doc. 70-1, p. 5). In March 2019, he was transferred to Vienna, where he is also not allowed to have an Andis trimmer (Doc. 70-1, p. 5).

## DISCUSSION

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a plaintiff must demonstrate that they suffered from an "objectively serious medical condition" and that the defendant acted with a "sufficiently culpable state of mind, meaning the official he official knew or was aware of — but then disregarded — a substantial risk of harm to an inmate's health." *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994)).

Plaintiff claims that his Andis trimmer was necessary to minimize folliculitis flare-ups, and Defendants refused to allow him to have it repaired in 2017. Defendants argue that Plaintiff's folliculitis during the time period at issue did not constitute an objectively, serious medical condition (Doc. 60). The Court need not resolve that issue, however, because even assuming that Plaintiff's folliculitis was an objectively serious medical need,[9] no reasonable jury could find that Defendants were deliberately indifferent to that need by refusing to allow Plaintiff to have his Andis trimmer repaired.

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662 (quoting *Farmer*, 511 U.S. at 837). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073 (citation omitted). It is "something akin to recklessness." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 50 (2019) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

Defendant Baldwin can be disposed of easily. There is absolutely no evidence

---

[9] The Court notes that Plaintiff previously filed another case in this District against prison officials at Menard for not allowing him to use his Andis trimmer: *Williams v. Harrington, et al.*, SDIL Case Number 14-cv-660-NJR-RJD. In that case it was determined that Plaintiff's folliculitis did not constitute a serious medical need. *Id.* at Doc. 112.

Baldwin ever received or reviewed the request Plaintiff sent him in April 2017 or otherwise knew about Plaintiff's issue with the Andis trimmer. There is also no evidence Baldwin was in any way involved in the refusal to allow Plaintiff to get the trimmer repaired. *E.g., Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (citation and internal quotation marks omitted). And Baldwin cannot be held liable solely because he was in charge. *E.g., Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 507–08 (7th Cir. 2017) ("[T]here is no vicarious liability in a suit under section 1983."). Consequently, there is no basis for holding Director Baldwin liable for deliberate indifference under § 1983, and he is entitled to summary judgment.

As for Assistant Warden Love, Christine Brown, and Warden Jaimet, Plaintiff cannot establish they possessed the requisite mental state. The Court notes these Defendants had conflicting opinions as to whether Plaintiff needed a medical permit to possess his Andis trimmer at Pinckneyville, and Plaintiff was likely given inconsistent directives at various times on this while he was housed at Pinckneyville. These Defendants also could not give a clear or consistent answer as to why Plaintiff was not allowed to have his Andis trimmer repaired in 2016/2017, despite being allowed to have it repaired in 2015. Plaintiff's frustration under these circumstances is certainly understandable. That being said, no reasonably jury could find that Defendants' refusal to allow the trimmer to be repaired was unconstitutional.

There is no evidence that the Andis trimmer was medically *necessary*, or that Defendants knew as much. When Plaintiff's trimmer first stopped working properly in

late 2016, he did not have a medical permit for it. Plaintiff later obtained a medical permit from Dr. Scott on November 22, 2016, but the doctor rescinded the permit by early January 2017, and explicitly stated there was no medical indication that it was needed. This suggests that the doctor issued the permit because he was simply indulging Plaintiff's preference for the trimmer, not because he believed the trimmer was medically necessary. PA Adesanya affirmatively indicated a special trimmer is never needed to treat folliculitis.

Furthermore, Defendant Love testified that he did not know if the Andis trimmer was advertised to be useful for avoiding folliculitis, and he had never heard of anyone aside from Plaintiff say anything about a particular trimmer being more useful than others at preventing folliculitis outbreaks (Doc. 60-4, pp. 7, 16). Christine Brown was likewise unaware of whether a particular brand of trimmer was considered useful for avoiding folliculitis (Doc. 60-8, p. 9). She also suggested it was less about the particular trimmer that was used and more about the techniques used to shave (*Id.* at pp. 9, 10). Karen Jaimet also did not know why Plaintiff did not want to use the trimmers that were available for purchase in the commissary (Doc. 60-7, p. 8). In other words, they all believed the clippers offered at the commissary were suitable for Plaintiff to use.

There is also nothing that suggests Defendants had any reason to believe they were exposing Plaintiff to a substantial risk of serious harm by making him go without his Andis trimmer. Without the trimmer, Plaintiff got ingrown hairs that sometimes turned into open sores. The medical staff provided him with treatment as needed for his ingrown hairs and the resulting sores, including antibiotics, creams, and ointments. And Plaintiff

admitted those treatments were helpful in resolving folliculitis outbreaks (Doc. 60-1, pp. 5, 35–36). Plaintiff, however, would like to avoid the outbreaks to begin with and using the Andis trimmer was his preferred method for doing so. But prisoners are not entitled to demand specific care. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). And no reasonable jury could find that denying Plaintiff his preferred trimmer was cruel and unusual under contemporary standards of decency or deprived him of his basic needs. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. 825, 833–34 (1994)) ("a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities."). This is simply not the type of inhumane, barbaric treatment the Eighth Amendment was intended to prevent. For that reason, Defendants Love, Jaimet, and Brown are entitled to summary judgment.

## CONCLUSION

Plaintiff Theopolis Williams' motion to strike (Doc. 69) is **DENIED**.

Defendants Karen Jaimet, Larue Love, Christine Brown, and John Baldwin's motion for summary judgment (Doc. 59) is **GRANTED**. Plaintiff's claims against these Defendants are **DISMISSED with prejudice** and judgment will be entered in their favor.

There being no claims or Defendants remaining in this action, the Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

IT IS SO ORDERED.

DATED: May 20, 2020

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**